# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

№ 10-CV-4667 (JFB)

———————————————

### JOSE HERNANDEZ,

Petitioner,

VERSUS

### WILLIAM LEE,

Respondent.

———————————————

**MEMORANDUM AND ORDER**
April 11, 2014

———————————————

JOSEPH F. BIANCO, District Judge:

Jose Hernandez (hereinafter "Hernandez" or "petitioner") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in the Supreme Court of the State of New York, County of Nassau (the "trial court"), for murder in the second degree (N.Y Penal Law § 125.25(1)) and gang assault in the first degree (N.Y. Penal Law § 120.07). Petitioner was sentenced to a term of imprisonment of twenty-five years to life.

Petitioner challenges his conviction on the following grounds: (1) the prosecution failed to establish his identity as the stabber beyond a reasonable doubt; (2) the evidence was insufficient to support a finding of guilt beyond a reasonable doubt; (3) he was denied the effective assistance of counsel; (4) he was deprived of his right to a fair trial by the comments of the prosecutor; and (5) he was denied his right to a fair trial because the jury was not instructed that it could draw an adverse inference from the prosecution's failure to call most of the material witnesses to the crime.

For the reasons set forth below, the Court concludes that petitioner's claims of prosecutorial misconduct and failure to give a missing witness charge are procedurally barred. In any event, the Court has examined all of the petitioner's claims on the merits and determines that there is no basis for habeas relief.

## I. BACKGROUND

### A. Facts

The following facts were adduced from the petition and documents attached thereto, as well as from the state court trial and appellate record.

On November 16, 2005, Christian Pagan ("Pagan") was stabbed in the chest and groin at 416 Clinton Street in Hempstead, New York, which was the location of the Laundry Palace. (Tr.[1] at 654, 668.) Pagan was a twenty-three year old member of the gang Salvadorans With Pride ("SWP"), and the Laundry Palace was a known SWP hangout. (*Id.* at 601, 629.)

Police Officer Martino Derisi and his partner Officer Espina arrived at the Laundry Palace around 9:12 p.m. and found Pagan lying face up in a pool of blood. Officer Derisi called for an ambulance. When emergency medical technicians arrived at the scene at approximately 9:20 p.m., Pagan was in cardiac arrest. (*Id.* at 554–55.) On the way to Winthrop University Hospital, ambulance medical technicians attempted to revive Pagan, but he eventually died at the hospital at 9:55 p.m. as a result of multiple stab wounds to the chest and groin, resulting in perforations to the heart and left lung. (*Id.* at 555–56, 666.) Doctor Brian O'Reilly performed an autopsy on Pagan on November 17, 2005. (*Id.* at 654.) A toxicology test revealed that Pagan had approximately a .25 percent blood alcohol content at the time of his death. (*Id.* at 670–71.)

On November 16, 2005, after Pagan was taken to the hospital, several more police officers went to the crime scene. (*Id.* at 609.) Detective Bruce Schurmann of the Crime Scene Search Section arrived at the Laundry Palace at 10:45 p.m. and photographed and videotaped the laundromat. (*Id.* at 487–88.) He also dusted for fingerprints and collected physical evidence, which included concrete pieces, a stone, a black plastic bag, a t-shirt and a sweatshirt. (*Id.* at 496, 501, 512.) Detective Barbara Stemmle of the Latent Fingerprint Section testified at trial that

there were no identifiable fingerprints on the black plastic bag. (*Id.* at 565.) Four latent fingerprints were lifted from some of the other recovered items, but none matched petitioner's or Yoni Martinez's ("Martinez") prints.[2] (*Id.* at 568–69.) Detective Stemmle testified that the concrete pieces were not good surfaces for fingerprint impressions because they were too rough. (*Id.* at 561–65.) Detective Aylward, the lead detective on the investigation of Pagan's death, interviewed approximately six or seven witnesses who were present at the Laundry Palace that evening. (*Id.* at 544, 546.)

### 1. Evidence of Motive

There was evidence introduced at trial regarding the events that preceded the death of Pagan, which established a motive for the killing. That evidence is summarized below.

On November 16, 2005, petitioner and four of his friends gathered in Hempstead, New York. (*Id.* at 739.) The group consisted of petitioner, Martinez, Roquetta, Ardillo, and Fantasma,[3] (*id.* at 747), who were all members of the El Salvadoran gang Mara Salvatrucha, commonly known as MS-13. (*Id.* at 622.) Martinez informed the group that his friend was beaten with sticks the prior week by members of MS-13's rival gang, SWP. (*Id.* at 748.) Petitioner and the other members of the group agreed that they should seek out revenge on an SWP member

---

[1] "Tr." refers to the transcript of petitioner's trial.

[2] Martinez is a friend and fellow gang member of petitioner. He pled guilty to stabbing Pagan on July 21, 2006, and is now serving twelve years in prison. (*See* Resp't Supp. Aff. Ex. B.) In his plea allocution, Martinez admitted to stabbing Pagan and stated that petitioner had also stabbed Pagan. (*Id.*) Martinez's plea allocution was never introduced at petitioner's trial. The absence of Martinez's plea allocution from trial will be discussed in more detail *infra*.

[3] Roquetta, Ardillo and Fantasma were the nicknames petitioner used to identify the members of the group he was with. (Tr. at 739.)

to get even for SWP's assault on Martinez's friend. (*Id.* at 748.)

Petitioner admitted in a sworn statement to Detective Aponte that MS-13 and SWP do not get along, and that his group wanted to demonstrate to the members of SWP that MS-13 was a more powerful gang. (*Id.* at 739.) The group decided to walk towards the Laundry Palace, a known SWP hangout, located on 416 Clinton Street in Hempstead, New York. (*Id.* at 601, 629.) The exterior wall of the Laundry Palace contained graffiti of both MS-13 and SWP, which was a sign of gang conflict. (*Id.* at 631–33.)

As petitioner's group approached Clinton Street, they picked up rocks and broken pieces of concrete from the ground to use to throw at the first SWP member they could find. (*Id.* at 748.) Petitioner placed concrete and rocks in his pockets, while others carried bats, and Martinez carried a knife in his waistband. (*Id.* at 748.)

When the group arrived at the Laundry Palace, petitioner spotted Pagan. (*Id.*) Petitioner knew that Pagan was an SWP member because he witnessed Pagan graffiti the Laundry Palace for SWP on a prior occasion. (*Id.*) Petitioner then flashed MS-13 hand signals to Pagan, who responded with SWP hand gestures. (*Id.*) It was at that point that some members of petitioner's group followed Pagan into the Laundry Palace. (*Id.*) The altercation began at approximately 9:15 p.m. (*Id.* at 601.) In a sworn statement to the police, petitioner stated that three members of his group rushed in (*id.* at 748), while at trial an employee of the laundromat (discussed below) testified that only two members of petitioner's group went into the Laundry Palace (*id.* at 581–85.)

## 2. Eyewitness Testimony

At trial, only one eyewitness was called by the prosecution to testify (*id.* at 575), although there were approximately six or seven customers in the Laundry Palace at the time of the altercation (*id.* at 544, 46). The prosecution called Lus Amanda Rodriguez ("Rodriguez"), an employee of the Laundry Palace who had worked there for two years. (*Id.* at 575–76.) Rodriguez was in the back office of the Laundry Palace with her husband Miguel Quillen at around 9:10 p.m. on November 16, 2005. (*Id.*) Rodriguez testified that a Hispanic man, a dark-skinned man, and Pagan entered the laundromat. (*Id.* at 580–81.) At trial, Rodriguez testified that she heard a loud noise from the back office, which sounded like the front door slamming open. (*Id.* at 577.) It was at that point that she stood up to observe what was happening in the main area of the Laundry Palace. (*Id.* at 578–79.) Although Rodriguez could not see anything at the time of the first noise, she had a view of the front doors when she heard a second noise that sounded like something hitting the coin kiosk.[4] (*Id.*) Rodriguez testified that two men entered the laundromat to confront Pagan, who had been at the Laundry Palace earlier to use the restroom. (*Id.* at 580–81.) She described one of the men as Hispanic, thin, and a little taller than 4'10''. (*Id.*) Rodriguez testified that the Hispanic man was wearing a baseball cap and had a light mustache. (*Id.*) Rodriguez described the other man as black and tall. (*Id.* at 581.) Rodriguez testified that she made eye contact with the stabber during the altercation. (*Id.* at 597.)

At trial, Rodriguez testified that the thin Hispanic man threw stones at Pagan. (*Id.*) One of the stones struck Pagan in the face,

---

[4] Rodriguez referred to the coin kiosk as the "computer" at trial. (*Id.* at 578.)

causing him to bleed and then collapse onto the ground. (*Id.* at 580.) Rodriguez said that, once Pagan was on the ground, the thin Hispanic man took out a knife and stabbed Pagan once in the chest. (*Id.* at 581.) She described the knife as about sixteen to eighteen inches in length with a wooden hilt. (*Id.*)

Rodriguez testified that the Laundry Palace was brightly lit during the entire altercation (*id.* at 585), and that she was as close as six feet from Pagan and at most fifteen to twenty feet away at all times (*id.* at 585, 597). Rodriguez stated that, after the thin Hispanic man stabbed Pagan, the stabber and the tall black man left the Laundry Palace and ran away. (*Id.* at 587–88.) Two other Hispanic men who were waiting outside also fled the scene. (*Id.* at 587–88.) Rodriguez testified that the entire incident lasted no longer than one minute. (*Id.* at 598.) Rodriguez made conflicting statements as to whether she called the police during the altercation or after the fight had ended. (*Id.* at 607–09.)

On December 20, 2005, at 7:25 p.m., Rodriguez went to the Robbery Squad on Newbridge Road in Bellmore, N.Y. to identify Pagan's stabber from a lineup. (*Id.* at 588.) Rodriguez selected petitioner from the lineup. (*Id.*) At trial, Rodriguez was not able to identify petitioner as the stabber in court. (*Id.*) However, the prosecution introduced evidence, including photographs of petitioner shortly after the murder, to establish that petitioner's appearance had changed substantially from the time of the lineup. (*Id.* at 779–81.)

### 3. Petitioner's Sworn Statement

Petitioner was arrested and questioned by Detective Milton Aponte on December 19, 2005. (*Id.* at 684, 739.) Without an attorney present, petitioner voluntarily gave a sworn statement to Detective Aponte. (*Id.* at 747.) Detective Aponte is certified by the Nassau County Police Department as a Spanish interpreter. (*Id.* at 731–32.)

In petitioner's sworn statement to Detective Aponte, he stated that he was with a group of four other MS-13 members and that they decided to seek out revenge on an SWP member. (*Id.* at 747–48.) He claimed that Martinez stabbed Pagan twice in the chest with a knife that Martinez kept in his waistband. (*Id.* at 748.) Petitioner further stated that he did not participate in the stabbing himself. (*Id.*) However, petitioner admitted that he threw rocks at Pagan's face and chest both before and after Martinez stabbed Pagan. (*Id.*) Petitioner also stated that the two members who did not enter the Laundry Palace were Roquetta and Fantasma, but that the other three members went inside. (*Id.*) Petitioner admitted in his sworn statement that, after Pagan was stabbed and he threw a rock at him, he fled the Laundry Palace with Martinez and the other four members of his group. (*Id.* at 748–49.)

### B. Procedural History

### 1. State Court Proceedings

### a. Pre-trial Suppression Hearing

From February 13 to 15, 2007, Judge Calabrese held a pre-trial suppression hearing to determine whether petitioner's oral, written, and videotaped statements after his arrest were admissible. (Def.-Appellant Br. at 4.) Petitioner argued that his statements had been obtained in violation of his constitutional right against self-incrimination. (Resp't Aff. at 2; Def. Appellant Br. at 7–8.) Petitioner claimed further that he had been deprived of food and sleep for twenty-six hours, and only after that did he agree to give a sworn

statement about the events that occurred on November 16, 2005. (Def.-Appellant Br. at 7.) Petitioner also contended that Detective Aponte failed to take down the entirety of his statement, but rather picked and chose particular sentences. (*Id.* at 7.)

Petitioner's motion to suppress his statements was denied in all respects on February 22, 2007. (*Id.* at 8.) Judge Calabrese found that the police had probable cause to arrest petitioner,[5] the identification procedure was not suggestive, the lineup was not suggestive, and that petitioner's statements were made after proper *Miranda* warnings were administered. (*Id.*)

b. Trial and Sentencing

The following details of petitioner's trial are relevant to the instant petition. At trial, the prosecution presented its case by calling police personnel, an eyewitness, a medical examiner, and fingerprint analysts. (Resp't Aff. at 4–6.) The prosecution also introduced petitioner's own sworn statement made after his arrest through the testimony of Detective Aponte. (*Id.* at 6.) The prosecution's case relied on Rodriguez's description of the events on November 16, 2005, as well as her subsequent identification of petitioner in a lineup on December 20, 2005. (*Id.* at 4–6.) The prosecution argued that petitioner had stabbed Pagan in the chest after first hitting him with a rock, which caused Pagan to fall to the floor. (Tr. at 855.) The prosecution also argued, in the alternative, that even if petitioner had not been the person who fatally stabbed Pagan, he had acted in concert with the other MS-13 members, one of whom stabbed Pagan. (*Id.* at 853–54, 864.)

The prosecution tried to establish petitioner's intent to kill by noting that he threw rocks at Pagan both before and after he was stabbed. (*Id.* at 855, 860, 862.) Further, the prosecution stressed that petitioner had met with fellow MS-13 members earlier in the night and had made a conscious decision to get even with SWP for an assault on Martinez's friend. (*Id.* at 853.) The prosecution argued that petitioner's actions, therefore, clearly established his intent to kill Pagan, a member of SWP who was at the Laundry Palace, a known SWP hangout. (*Id.* at 858–60.) The prosecution argued that, even if petitioner had not stabbed Pagan, he had acted in concert with the other MS-13 members and his actions showed his intent to kill Pagan. (*Id.* at 862, 864.)

The defense focused its argument on Rodriguez's inability to identify petitioner in court and the prosecution's failure to call any additional eyewitnesses to testify. (*Id.* at 807, 811–12.) Defense counsel also attempted to impeach Rodriguez's credibility through her cross-examination and summation. Counsel considered calling witnesses who had failed to identify petitioner from a photo array. (*Id.* at 403.) However, defense counsel later declined to do so after Rodriguez failed to identify petitioner in court. (*Id.* at 807.)

Defense counsel chose to not introduce Martinez's plea allocution, in which he admitted to stabbing Pagan at the Laundry Palace on November 16, 2005. (*Id.* at 232.) Counsel was unable to find case law that supported admitting only the portions of Martinez's plea allocution where he admitted to stabbing Pagan. (*Id.* at 236.) Defense counsel was concerned that, if part of Martinez's allocution were admitted into evidence, the prosecution would be entitled to introduce the other part of Martinez's allocution, in which Martinez stated that

---

[5] As noted *supra*, Rodriguez identified petitioner as Pagan's stabber, which, the hearing court concluded, created the probable cause necessary to arrest petitioner.

petitioner had also stabbed Pagan. (*Id.* at 237.)

At the close of evidence, defense counsel moved to dismiss the case on the basis of insufficient evidence. The trial judge denied defense counsel's motion. On March 13, 2007, the jury returned a guilty verdict for murder in the second degree, and a guilty verdict for gang assault in the first degree. (*Id.* at 934–36.)

On April 25, 2007, petitioner was sentenced to an indeterminate term of imprisonment of twenty-five years to life for his second degree murder conviction. (Resp't Mem. at 6.) Petitioner was also sentenced to a concurrent, determinate term of twenty-five years imprisonment with five years' post-release supervision for his conviction of gang assault in the first degree. (*Id.*)

c. The Direct Appeal

With the assistance of counsel, petitioner filed an appeal from his conviction in the Supreme Court of the State of New York, Appellate Division, Second Department ("Appellate Division"). Petitioner argued the following: (1) the evidence was legally insufficient to prove his guilt of murder in the second degree; (2) the verdict was against the great weight of the evidence; (3) he was deprived of a fair trial as a result of prosecutorial misconduct; (4) he was entitled to a missing witness charge, which the trial court did not provide; and (5) he was denied the effective assistance of counsel. (Def.-Appellant Br. at 15, 25, 33, 45, 53.)

On June 1, 2010, the Appellate Division rejected petitioner's claims and affirmed his conviction. *People v. Hernandez*, 74 A.D.3d 839 (N.Y. App. Div. 2010). The Appellate Division held that the evidence was legally sufficient to establish petitioner's guilt for murder in the second degree beyond a reasonable doubt, and that the verdict was not against the great weight of the evidence. *Id.* Further, the Appellate Division held that petitioner's claim regarding the trial court's failure to give a missing witness charge was unpreserved and unreviewable,[6] and that the prosecutorial misconduct claim was both unpreserved and meritless. *Id.* at 840. Finally, the Appellate Division found that petitioner's ineffective assistance of counsel claim was meritless. *Id.* The court held that petitioner had meaningful representation at all stages of the proceedings. *Id.* Further, the Appellate Division found that defense counsel's decision not to present evidence about a codefendant's arrest and plea allocution, or photo arrays, reflected a reasonable and legitimate strategy under the circumstances and evidence presented. *Id.* (citing *People v. Benevento*, 91 N.Y.2d 708, 713 (1998)).

Petitioner's application for leave to appeal to the New York Court of Appeals was denied on August 31, 2010. *People v. Hernandez*, 15 N.Y.3d 805 (2010).

2. The Instant Petition

Proceeding *pro se*, petitioner filed the instant petition for a writ of habeas corpus, together with his brief in support of the petition, on November 8, 2010. Respondent filed a memorandum of law in opposition to the petition on March 2, 2011. The Court heard oral argument via telephone on July 26, 2011. At the conclusion of oral argument, the Court ordered respondent to submit the following documents by September 9, 2011: an affidavit from petitioner's trial attorney, Martinez's guilty

---

[6] Defense counsel had not requested a missing witness instruction at trial, and there were no discussions concerning it on the record.

plea transcript, and statements by eyewitnesses who had not testified at trial. The Court also appointed Martin Goldberg, Esq. ("Goldberg") from the Court's Habeas Corpus Panel of Attorneys to represent petitioner in this matter.

On August 29, 2011, respondent filed a supplemental opposition to the petition. Included in respondent's supplemental submission were three exhibits: (1) an affidavit from petitioner's trial counsel, Dana Grossblatt, Esq. ("Grossblatt"), in which she explained her trial strategy; (2) the transcript of Martinez's guilty plea; and (3) letters from a private investigator to Grossblatt, in which the private investigator memorialized his interviews with Martinez and other witnesses to the Pagan stabbing who had failed to identify petitioner in photo arrays (but who did not testify at petitioner's trial). In response to respondent's supplemental opposition, petitioner's counsel (Goldberg) submitted a letter to the Court on October 3, 2011. In essence, Goldberg's letter explained why petitioner's ineffective assistance claim could not meet the test for ineffective assistance of counsel set forth in *Strickland v. Washington*. At the conclusion of the letter, petitioner's counsel disclosed that he was currently co-counsel with petitioner's trial counsel (Grossblatt) on a pending criminal case in state court, but that he had met Grossblatt only one week earlier. After receiving this letter, in an abundance of caution, the Court relieved Goldberg from his representation of petitioner on December 5, 2011. The Court then appointed Richard Langone, Esq. ("Langone") from the Court's Habeas Corpus Panel of Attorneys to represent petitioner.

Petitioner, represented by Langone, filed a reply to respondent's supplemental opposition on January 31, 2012. With leave of the Court, respondent filed a sur-reply on February 21, 2012. Petitioner filed a response to respondent's sur-reply on March 7, 2012 (also with the Court's permission). This matter is fully submitted, and the Court has considered all of the parties' submissions.

II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Section 2254 provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of

the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "'some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION

### A. Procedural Bar

A petitioner's claims may be procedurally barred from habeas corpus review if they were decided at the state level on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729–33 (1991). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case" by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 261–63 (1989) (internal quotation marks omitted). The procedural rule at issue is adequate if it is "firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks omitted). However, there is a "small category" of "exceptional cases in which [an] exorbitant application of a generally sound [procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002). Nevertheless, "principles of comity . . . counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion lightly or without clear support in state law." *Garcia*, 188 F.3d at 77 (quotation marks omitted).

If a claim is procedurally barred, a federal habeas court may not review the claim on the merits unless the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750. Petitioner may demonstrate cause by showing one of the following: "(1) the factual or legal basis for a petitioner's claim was not reasonably available to counsel, (2) some interference

by state officials made compliance with the procedural rule impracticable, or (3) the procedural default was the result of ineffective assistance of counsel." *McLeod v. Graham*, No. 10-CV-3778 (BMC), 2010 WL 5125317, at *3 (E.D.N.Y. Dec. 9, 2010) (citing *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994)). Prejudice can be demonstrated by showing that the error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that, "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" and would require "new reliable evidence . . . that was not presented at trial." *House v. Bell*, 547 U.S. 518, 536–37 (2006).

### 1. Missing Witness Charge

Petitioner's claim that the trial court failed to issue a missing witness charge to the jury is procedurally barred because the state court relied on a firmly established procedural rule to deny this claim. The Appellate Division denied petitioner's claim that he was denied a fair trial because the jury had not been instructed that it could draw an adverse inference from the absence of certain eyewitnesses. Defense counsel did not object, or ask for a missing witness charge, during the trial. Defense counsel also did not request a different instruction on the basis that the court's instruction was improper. *Hernandez*, 74 A.D.3d at 840. Therefore, the record was devoid of any

request for a missing witness charge or an objection to the jury instructions.

Failure to preserve an issue for state appellate review by not objecting to the language used by the trial court during the jury charge or not requesting a different jury instruction on the basis that the trial court's instruction was improper is an adequate and independent procedural ground recognized in New York State. See N.Y. C.P.L. § 470.05; *see Murray*, 477 U.S. at 485–93 (contemporaneous objection rule is an independent and adequate state ground); *Wainwright v. Sykes*, 433 U.S. 72, 86–92 (1977) (same); *Glenn v. Bartlett*, 98 F.3d 721, 724–26 (2d Cir. 1996) (same); *Owens v. Portuondo*, No. 98-CV-6559 (AJP), 1999 WL 378343, at *6 (S.D.N.Y. June 9, 1999) (same); *Torres v. Irvin*, 33 F. Supp. 2d 257, 263–65, 273–75 (S.D.N.Y. 1998) (same); *Vera v. Hanslmaier*, 928 F. Supp. 278, 285 (S.D.N.Y. 1996) ("Failure to object at trial is an independent and adequate state procedural bar."); *Jamison v. Smith*, No. 98-CV-3747 (FB), 1995 WL 468279, at *2 (E.D.N.Y. July 26, 1995) ("Courts in this circuit have consistently held that the failure to object contemporaneously . . . constitutes an adequate and independent basis for barring habeas review."); *Anderson v. Senkowski*, No. 92-CV-1007, 1992 WL 225576, at *4 (E.D.N.Y. 1992) (same), *aff'd*, 992 F.2d 320 (2d Cir. 1993). As stated *supra*, the Appellate Division held that this claim was unpreserved for review. *Hernandez*, 74 A.D.3d at 840. Because the Appellate Division dismissed petitioner's claim on an independent and adequate state law ground, the Court is procedurally barred from reviewing this claim.

Moreover, petitioner has demonstrated neither "cause and prejudice" for his procedural default, nor that failure to consider his claim will result in a miscarriage of justice. In his petition and

memorandum of law, petitioner has wholly failed to explain why neither he nor his defense counsel objected to the language used by the trial court during the jury charge, and why they both failed to request a different jury instruction on the basis that the trial court's instruction was allegedly improper.[7] Accordingly, petitioner's improper jury charge claim is procedurally barred.

## 2. Prosecutorial Misconduct

Additionally, petitioner's claim that he was denied his right to a fair trial due to prosecutorial misconduct is procedurally barred because the state court relied on a firmly established procedural rule to deny this claim. *Hernandez*, 74 A.D.3d at 840. Defense counsel never informed the trial court that she believed the prosecutor was committing misconduct or that her actions were so egregious that they denied petitioner's right to a fair trial. Therefore, the Appellate Division decided that petitioner's prosecutorial misconduct claim was unpreserved for review. *Id.*

Furthermore, the fact that the Appellate Division ruled in the alternative on the merits of petitioner's prosecutorial misconduct claim does not preserve petitioner's claim for review. *Id.*; *see also Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810–11 & n. 4 (2d Cir. 2002) ("[W]here a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved"); *Glenn v. Bartlett*, 98 F.3d 721, 724–25 & n. 3 (2d Cir. 1996) (holding that state decision that denied prosecutorial misconduct claim as not

preserved for appellate review represented an independent and adequate state procedural ground even though court addressed merits of claim "in the interest of justice"); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (holding that state decision denying claims as procedurally barred but also addressing merits rested on adequate and independent state ground).

Finally, petitioner has neither demonstrated "cause and prejudice" from the failure to raise this issue, nor established that the failure to consider this claim would result in a miscarriage of justice. Accordingly, his prosecutorial conduct claim is procedurally barred.

For the aforementioned reasons, petitioner's missing witness charge and prosecutorial misconduct claims are procedurally barred. However, in an abundance of caution, this Court addresses the merits of the claims *infra*, and finds that they are meritless.

## B. Merits

For the reasons set forth below, the Court concludes that there is no basis for habeas relief.

### 1. Sufficiency of the Evidence Claim

#### a. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus. *Einaugler v. Sup. Ct. of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)). A criminal conviction in state court will not be reversed

---

[7] In other words, even if defense counsel had requested a missing witness charge, it is unclear from the record that it would have been granted, and, therefore, petitioner's counsel was not ineffective. This claim is discussed in more detail, *supra*.

if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (internal quotation marks omitted) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

## b. Application

Petitioner argues that the prosecution failed to present sufficient evidence to prove his guilt beyond a reasonable doubt. This Court also construes petitioner's claim that the prosecution failed to establish his identity as the stabber beyond a reasonable doubt as a legal sufficiency claim.[8] Upon review of the record, it is clear that the prosecution presented sufficient evidence from which a rational trier of fact could conclude beyond a reasonable doubt that petitioner was guilty of murder in the second degree, either on the theory that petitioner had been the principal actor or an accomplice.

### i. Petitioner as the Principal Actor

Under New York law, a person is guilty of second degree murder when the following elements are proven beyond a reasonable doubt: (1) "[w]ith intent to cause death of another person, he causes the death of such person or of a third person"; or (2) "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. Penal Law § 125.25.

---

[8] To the extent that petitioner is also raising a weight of the evidence claim, this Court cannot review it. A "weight of the evidence" claim is based on state law. *See Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."). The Court cannot consider a purely state law claim on federal habeas review. *See, e.g.*, *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law . . ."). Therefore, to the extent petitioner raises a claim that his conviction was against the weight of evidence, the Court does not consider it.

Petitioner argues that there was insufficient evidence presented at trial to establish his guilt beyond a reasonable doubt. (Def.-Appellant Br. at 15.) Petitioner asserts that the case was "troubling" because it involved the testimony of only one eyewitness, who could not identify petitioner in court. (*Id.*) Further, petitioner claims that there was a lack of physical evidence to establish that he had been the person who had stabbed Pagan. (*Id.* at 21.)

Although the prosecution only called one eyewitness, Rodriguez viewed the altercation from only fifteen to twenty feet away, at times being as close as six feet to Pagan. (Tr. at 585, 597.) Rodriguez testified to making eye contact with Pagan's assailant. (*Id.* at 597.) She also testified that the Laundry Palace was brightly lit. (*Id.* at 585). The jury could have concluded that her testimony was reliable based on her vicinity to the altercation and the viewing conditions of the Laundry Palace. Additionally, Rodriguez testified that a Hispanic man stabbed Pagan in the chest. (*Id.* at 580–81.) She also testified to identifying petitioner as Pagan's stabber in a lineup on December 19, 2005. Rodriguez could not identify petitioner in court, but the prosecution introduced evidence to establish that petitioner's appearance had changed since the lineup. Petitioner argues that his appearance could not have changed to the point where Rodriguez would not have been able to identify him in court. However, the prosecution entered photographs of petitioner in evidence, and the jury certainly had a sufficient rational basis to find Rodriguez's testimony and prior identification of petitioner to be credible.

Petitioner also argues that Rodriguez's testimony that he stabbed Pagan once in the chest was inconsistent with the medical examiner's testimony that Pagan had two stab wounds in the chest and one near his groin. (Def.-Appellant Br. at 17.) This Court finds that there was evidence introduced by the prosecution to construe Rodriguez's and Dr. O'Reilly's testimonies in a consistent manner. The jury could have found that Pagan was stabbed upon entering the Laundry Palace, since a blood trail led from the front doors to the coin kiosk. (Resp't-Appellant Br. at 15.) Therefore, the jury could have found that Rodriguez's testimony was credible because she only witnessed the events that occurred after Pagan was near the coin kiosk. It would be consistent with the physical evidence and Dr. O'Reilly's testimony if Pagan had been stabbed once near the entrance of the Laundry Palace before Rodriguez came out of the back office to witness what was occurring near the coin kiosk. The stab that Rodriguez witnessed therefore could have been the second or third stab.

The prosecution also introduced other evidence that could have led a rational jury to find beyond a reasonable doubt that petitioner fatally stabbed Pagan. The prosecution presented evidence that petitioner agreed with other MS-13 members to get even with a member of SWP. The prosecution introduced petitioner's own sworn statement, in which he stated that he and his friends went to the Laundry Palace carrying knives, rocks, and bats to seek revenge on a SWP member.

In sum, a rational trier of fact could have concluded that petitioner was guilty beyond a reasonable doubt of fatally stabbing Pagan. Accordingly, petitioner cannot be granted habeas relief on the basis of insufficient evidence.

ii. Petitioner as an Accomplice

Under New York State law, a person may be held accountable for aiding or acting in concert "when, acting with the mental

culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." N.Y. Penal Law § 20.00.

Petitioner also argues that there was not enough evidence to establish his guilt beyond a reasonable doubt under a theory of acting in concert. (Def.-Appellant Br. at 21.) Petitioner asserts that there was insufficient evidence to establish his intent to kill Pagan, and that the prosecution's evidence did not lead exclusively to the inference that, by throwing stones at Pagan, he intended to effect death. (*Id.* at 29.) This Court concludes that there was legally sufficient evidence to sustain a conviction on an accomplice theory of liability.

Petitioner admitted in his own sworn statement to the police that he wanted to seek revenge on a member of SWP. (Tr. at 739.) He also admitted that he went to the Laundry Palace armed with rocks (*Id.* at 740.) Petitioner witnessed the other MS-13 members in his group carry rocks, knives, and bats to the Laundry Palace. (*Id.* at 739-40.) The jury heard testimony about the rivalry between MS-13 and SWP (*id.* at 739), and could have rationally inferred that by seeking revenge or getting even that the gang (including petitioner) wanted to cause the death of an SWP member. The jury also heard evidence that established petitioner's intent to kill Pagan from the circumstances surrounding Pagan's death. *See In re Tatiana N.*, 899 N.Y.S.2d 21, 24 (N.Y. App. Div. 2010) ("the necessary knowledge and intent [to prove accessorial liability] need not be admitted directly or verbally acknowledged. They may be established through the actions of the accused, based on the entire series of events."). Petitioner admitted to throwing rocks at Pagan both before and after he was stabbed. The jury could have rationally inferred that, if

petitioner had thrown rocks at Pagan, that he shared the intent to kill Pagan with the primary stabber both before and during the stabbing. *See People v. James*, 198 A.D.2d 146 (N.Y. App. Div. 1993) (finding that it was reasonable for the jury to infer intent to kill after defendant beat the complainant after it was apparent that the stabber had homicidal intent). The jury also could have inferred that, when petitioner initially threw a rock at Pagan, which caused him to fall to the floor, the throwing of the rock was done in order to aid Martinez by making Pagan vulnerable and easier to attack. *See People v. Martinez*, 30 A.D.3d 353, 353–354 (N.Y. App. Div. 2006) (holding evidence was sufficient to establish defendant acted in concert where defendant knocked the victim down and the codefendant inflicted fatal injuries). The jury could have rationally discredited the argument that petitioner had not known that Martinez's knife would be used to kill, but only thought it would be used to injure. (Def.-Appellant Br. at 31.)

Thus, even if the jury did not find beyond a reasonable doubt that petitioner fatally stabbed Pagan, there was sufficient evidence to establish that petitioner acted in concert with the intent to cause Pagan's death. Accordingly, petitioner cannot be granted habeas relief on the basis of insufficient evidence.

### iii. One Eyewitness

Petitioner claims in his brief that the prosecution's case against him was troubling because it only involved one eyewitness, Rodriguez, whose testimony may have conflicted with Dr. O'Reilly's testimony. However, the credibility of Rodriguez's testimony was within the province of the jury, and, as noted *supra*, there was more than a sufficient basis for a rational jury to find her credible. Additionally, as discussed *supra*, her testimony could have been found

to be consistent with Dr. O'Reilly's testimony.

The prosecution's case cannot be deemed insufficient for only calling one eyewitness to testify at trial. *See, e.g., United States v. Gonzalez*, 110 F.3d 936, 940–41 (2d Cir. 1997) ("It is well settled that where, as here, the government's case is based primarily on eyewitness testimony describing criminal activity, 'any lack of corroboration [with physical evidence] goes only to the weight of the evidence, not to its sufficiency. The weight is a matter for argument to the jury, not a ground for reversal on appeal.'" (quoting *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989))); *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994) ("Although appellants emphasize the lack of physical evidence connecting them to the murder and contend that the testifying witnesses were not credible, a conviction may be based on circumstantial evidence and inferences based upon the evidence and the jury is exclusively responsible for determining a witness' credibility." (internal quotation marks omitted)). Indeed, the Second Circuit has held that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979). In short, petitioner's claim that the evidence was insufficient to establish his guilt beyond a reasonable doubt because it rested on the testimony of only one eyewitness is without merit.

## 2. Prosecutorial Misconduct Claim

### a. Legal Standard

"A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir.1999) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). For a claim of prosecutorial misconduct to rise to the level of constitutional error, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks omitted). "There must instead, be a showing that '[petitioner] suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Alexander v. Phillips*, No. 02-CV-8735(SAS)(FM), 2006 U.S. Dist. LEXIS 8926, at *40–41 (S.D.N.Y. Feb. 21, 2006) (report & recommendation) (quoting *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994)); *see also Dawkins v. Artuz*, 152 F. App'x 45, 46–47 (2d Cir. 2005) ("To warrant granting the writ, the prosecutorial misconduct must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Darden*, 477 U.S. at 181)). "[N]ot every trial error or infirmity which might call for the application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly*, 416 U.S. at 642 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). The Court must then review such comments by a prosecutor narrowly to determine whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).

To overcome this burden, petitioner must show that he "suffered actual prejudice because the prosecutor's comments during

summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley*, 41 F.3d at 824. Factors considered in determining such prejudice include: "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prosecutorial conduct." *Id.*; *accord United States v. Thomas*, 377 F.3d 232, 245 (2d Cir. 2004); *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990). "In addition, in determining whether a prosecutor's conduct was unconstitutional, a court 'must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's [remarks] . . . . If the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction.'" *Everett v. Fischer*, No. 00-CV-6300, 2002 WL 1447487, at *2 (E.D.N.Y. July 3, 2002) (quoting *Young*, 470 U.S. at 13–14) (alterations in original).

### b. Application

In the instant case, petitioner asserts several instances of prosecutorial misconduct that, he claims, deprived him of a fair trial. First, petitioner argues that the prosecutor introduced evidence in his summation that was outside the record. (Def.-Appellant Br. at 48.) Specifically, petitioner claims that the prosecutor committed misconduct in her summation when she said that Rodriguez had uncommon courage and did not "take off" during the altercation, as many people would do. (Tr. at 843.) Additionally, petitioner claims that the prosecutor committed misconduct when he phrased a redirect question in a prejudicial manner. (Def.-Appellant Br. at 48.) Specifically, petitioner points to the prosecutor's question asking Detective Aponte if he had any

personal knowledge of where the eyewitnesses were "at the time Jose Miguel Hernandez stabbed the victim to death." (Tr. at 790–91.) Petitioner argues that, by phrasing the question in that way, the prosecutor usurped the jury's function as fact-finder and contravened all notions of fairness. (Def.-Appellant Br. at 51.) Finally, petitioner argues that the prosecutor failed to observe fundamental fairness by presenting a case that petitioner stabbed Pagan. Petitioner claims that this was unfair because stabbing Pagan was something that "Martinez already admitted to doing" in his plea allocution. (*Id.* at 46.)

As noted *supra*, petitioner's claims are unpreserved for review by this Court because defense counsel did not ask for a curative instruction or request a mistrial after the prosecutor's redirect question to Detective Aponte or the comments in summation. However, even assuming the prosecutorial misconduct claim is preserved for review by this court, the Court concludes that the claim lacks merit.

### i. Severity

First, the prosecutor's question to Detective Aponte regarding whether he knew where the eyewitnesses were when petitioner "stabbed the victim to death," while improperly phrased, did not rise to the level of depriving petitioner of his right to a fair trial. *See, e.g.*, *Toro v. Herbert*, Nos. 01-CV-3386 (JBW), 03-MISC-0066 (JBW), 2003 WL 22992059, at *6 (E.D.N.Y. Sept. 29, 2003) (finding that petitioner was not denied a fair trial where prosecutor referred to defendant as a cold-blooded murderer). Petitioner did not suffer prejudice from the prosecution's question because it was already apparent that the prosecution's position was that petitioner fatally stabbed Pagan. (Resp. Br. at 39.) Furthermore, the prosecutor's question was not phrased so

egregiously so as to have a substantial and injurious effect on the petitioner. The prosecutor's phrasing of his question, while objectionable, certainly did not deprive petitioner of his right to a fair trial.

Second, the prosecutor's laudatory claim that Rodriguez did not "take off" during the altercation, as many people do, did not improperly introduce evidence outside the record or vouch for her credibility. (Tr. at 843.) Defense counsel attempted to impeach Rodriguez's credibility during summations by saying that she was a "simple woman" who could not even spell her own name. (*Id.* at 812.) The prosecutor, therefore, responded to the defense counsel's argument against Rodriguez's credibility by praising Rodriguez's courage for not leaving the scene and calling the police. The Second Circuit has noted that prosecutors are allowed to advocate vigorously during closing remarks and may use colorful adjectives in summation. *See United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995); *accord Coble v. Quarterman*, 496 F.3d 430, 438 (5th Cir. 2007) (rejecting habeas claim that trial counsel was ineffective for failing to object to prosecutor's comments during closing arguments describing petitioner as "a cold-blooded, merciless, remorseless killer"). Stating that Rodriguez was a courageous woman because she did not "take off" when the altercation began was certainly within the bounds of vigorous advocacy. Moreover, "[u]nder the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) (citing *United States v. Robinson*, 485 U.S. 25, 32 (1988)); *see also Everett v. Fischer*, No. 00-CV-6300, 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002) ("[T]he prosecutor's statements that the People's witnesses could have invented a more

convincing story if they had wanted to lie and that the witnesses had to face cross-examination by defense counsel were legitimate comments on the credibility of the People's witnesses, and a fair response to defense counsel's attack on the credibility of the People's witnesses in his summation."). Here, the prosecutor's summation was a fair response to defense counsel's attempts to impeach Rodriguez's credibility.

In any event, even assuming *arguendo* that the prosecutor's comments in summation were improper, the Court finds that they were not sufficiently severe to warrant habeas relief when considered in light of other facts. *See, e.g.*, *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990) (holding that although prosecutor's comment that he "would take one Carmella Ricciardelli to ten other witnesses" impermissibly bolstered the credibility of the witness, a writ of habeas corpus was still not appropriate where the improper behavior was limited to summation and did not permeate the trial); *Martin v. Brown*, No. 08-CV-0316 (JFB), 2010 WL 1740432, at *15 (E.D.N.Y. Apr. 29, 2010) ("In any event, even assuming *arguendo* that these or other comments by the prosecutor were improper, they were not severe or egregious and certainly did not render the trial so unfair as to deprive petitioner of his due process rights. Within the lengthy summation that involved an analysis of the trial evidence, the challenged comments did not play a substantial role in the summation, much less the entirety of the trial.").

Third, petitioner's claim that the prosecutor presented an unfair case because Martinez had already admitted to stabbing Pagan is wholly without merit. In the same plea allocution where Martinez admits to stabbing Pagan, he states that petitioner also stabbed Pagan. (Resp't Supp. Aff. Ex. B, at 12.)

### ii. Steps to remedy prejudice

In addition, any potential prejudice from the prosecutor's allegedly improper comments and questions was cured by jury instructions which reminded jurors that the arguments and questions of counsel are not evidence. *See, e.g.*, *Thompson v. Burge*, No. 05-CV-2914 (JFB), 2007 WL 2020185, at *16 (E.D.N.Y. July 6, 2007). At the beginning of trial, the judge informed the jury that questions are not evidence, and that no inferences should be drawn from questions. (Tr. at 456.) Furthermore, before summations, the trial judge informed the jury that the statements of the lawyers during summations are not evidence, and that if their statements contradicted the jury's interpretation of the evidence, the jury should rely on what they saw and heard. (*Id.* at 798–800.) Additionally, after the prosecutor asked Detective Aponte if he knew where the other witnesses were when petitioner "stabbed the victim to death," the court properly sustained defense counsel's objection as to form and cured the error. (*Id.* at 790–91.) Accordingly, "any potential threat to petitioner's constitutional rights was effectively neutralized by the trial judge instructions." *Thompson*, 2007 WL 2020185, at *16; *see United States v. Rivera*, 971 F.2d 876, 885 (2d Cir. 1992) (concluding that the trial court's instructions cured any prejudice arising from prosecutorial error).

### iii. Certainty of conviction absent misconduct

Finally, the Court concludes that the alleged misconduct was so minor (and addressed by the trial court's instructions) that, given the evidence introduced at trial, conviction was still certain absent the conduct in question.

\* \* \*

In sum, the three factors to determine prejudice from prosecutorial misconduct weigh heavily in respondent's favor. Accordingly, assuming *arguendo* that this Court is not procedurally barred from entertaining petitioner's claim of prosecutorial misconduct, the Court concludes that the claim lacks merit because the prosecutor's alleged misconduct was not so egregious so as to deprive petitioner of his right to a fair trial.

### 3. Missing Witness Charge

#### a. Legal Standard

To obtain a missing witness instruction under New York law, a defendant must establish three factors concerning the witness in question: (1) the witness had knowledge material to the trial; (2) the witness was expected to give noncumulative testimony favorable to the party against whom the charge is sought; and (3) the witness is available to the party who would be expected to call the witness. *McCrone v. Brown*, No. 07-CV-77 (JKS), 2008 WL 724234, at *9 (N.D.N.Y. Mar. 17, 2008) (citing *People v. Savinon*, 100 N.Y.2d 192 (2003)); *see also Davis v. Mantello*, 42 F. App'x 488, 491 (2d Cir. 2002). The Court provides these factors as background rather than a standard under which to consider petitioner's claim. This is because the failure to provide a missing witness charge in accordance with New York law is a matter of state law for which habeas relief is unavailable. *See, e.g.*, *Kirkby v. Filion*, 644 F. Supp. 2d 299, 307 (W.D.N.Y. 2009) ("Kirkby's missing witness charge claim raises only an issue of state law that cannot justify federal habeas relief."). Instead, on habeas review, the Court may consider only whether the failure to provide a missing witness charge violated petitioner's federal constitutional rights.

The Second Circuit has observed that a "missing witness charge invites the jury to draw an adverse inference against a party that fails to call a witness whose 'production . . . is peculiarly within [its] power.'" *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004) (quoting *United States v. Mittelstaedt*, 31 F.3d 1208, 1216 (2d Cir. 1994)). Further, as the Second Circuit has explained, "[b]ecause we recognize that 'an aura of gamesmanship' frequently accompanies requests for missing witness charges, we afford [trial] judges considerable discretion in deciding when they should and should not be given." *Id.* (citations omitted); *see also Reid*, 961 F.2d at 377 (noting that the decision to issue a missing witness charge "lies in the sound discretion of the trial court" (citation and quotation marks omitted)). Moreover, "[l]ike the failure to give any other jury instruction, the failure to issue a missing witness instruction does not raise a constitutional issue and cannot serve as the basis for federal habeas relief unless the failure 'so infected the entire trial that the resulting conviction violated due process.'" *Kloskin v. Conway*, 501 F. Supp. 2d 429, 444 (W.D.N.Y. 2007) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Finally, "[w]here, as here, the alleged error is one of omission, it 'is less likely to be prejudicial than a misstatement of the law,' thereby making the petitioner's 'burden . . . especially heavy.'" *Crews v. Herbert*, 586 F. Supp. 2d 108, 114 (W.D.N.Y. 2008) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

b. Application

Petitioner claims that habeas relief is appropriate because the jury was not instructed that it could draw an adverse inference from the prosecution's failure to call material witnesses to the crime. Petitioner argues that Detective Aylward should have been called as a witness at trial because he was the lead detective on the investigation of Pagan's death. (Def.-Appellant Br. at 54.) Petitioner states that Detective Aylward would have contributed material testimony since he was present at the Laundry Palace on the night of November 16, 2005, interviewed eyewitnesses, and conducted the investigation regarding Pagan's death. (*Id.*) Further, petitioner argues that, since the other eyewitnesses at the Laundry Palace potentially viewed the altercation between Pagan and members of petitioner's group, the prosecution should have called them once Rodriguez was unable to identify petitioner in court. (*Id.* at 55–58.) Petitioner claims that these eyewitnesses would have offered material and noncumulative testimony because there was a "very real issue" of whether petitioner was the stabber. (*Id.* at 60.)

Petitioner also argues that all of the witnesses were under the prosecution's control. Petitioner asserts that Detective Aylward was clearly under control of the prosecution as the lead detective of the investigation. (*Id.* at 61.) In addition, petitioner maintains that at least some of the five eyewitnesses were under the prosecution's control because the police were able to find and interview them about the events that took place at the Laundry Palace on November 16, 2005. (*Id.* at 60.) Petitioner claims that all that was needed for their presence at trial was an order to produce by the prosecution because two of the eyewitnesses were incarcerated. (*Id.*)

As noted *supra*, defense counsel neither requested a missing witness charge at any point during the trial, nor objected to the trial court's final charge, which did not contain a missing witness instruction. (Tr. at 908; Def.-Appellant Br. at 57.) Consequently, there is no evidence in the

record to evaluate the basis for the trial court's failure to give a missing witness charge, and this Court is procedurally barred from hearing this claim. *See supra*. Nonetheless, in an abundance of caution, this Court considers the merits of petitioner's claim and determines that it lacks merit.

As an initial matter, it is unclear whether the circumstances of petitioner's case even warranted a missing witness charge. Specifically, based on this Court's review of the record, it appears likely that the uncalled eyewitnesses would have given cumulative testimony. The eyewitnesses were present during the altercation at the Laundry Palace that resulted in the death of Pagan on November 16, 2005, just as Rodriguez was. Additionally, Rodriguez was right beside her husband, who was one of the uncalled five witnesses, during the incident. (Tr. at 599). It is unlikely that their perspective on the events would be different. *See Davis*, 42 F. App'x at 491–92 (finding testifying witness and missing witness were together throughout duration of the crime, and missing witness therefore would have added no new information). The Court is aware that Cynthia Ruiz ("Ruiz") and Kelbi Roque ("Roque"), two eyewitnesses to Pagan's stabbing who were interviewed by defense counsel's investigator, provided accounts that were slightly different from Rodriguez's testimony. (*See* Resp't Supp. Aff. Ex. C.) For example, Ruiz and Roque stated that four men entered the Laundry Palace. (*Id.* at 3.) However, Ruiz corroborates Rodriguez's testimony that only one person stabbed Pagan. Roque never saw anyone stab Pagan. (*Id.* at 6.) Even though Ruiz and Roque gave slightly different accounts of events, in comparing their accounts to that of Rodriguez, this Court believes that the trial court would not have abused its broad discretion in declining to give a missing witness instruction. *See Gaskin*, 364 F.3d at

463 (quoting *United States v. Torres*, 845 F.2d 1165, 1170–71 (2d Cir. 1988)); *see also Reid v. Senkowski*, 961 F.2d 374, 377 (2d Cir. 1992) (noting that decision to issue missing witness charge "lies in the sound discretion of the trial court") (citation and quotation marks omitted)).

More importantly, even if the failure to give a missing witness instruction violated New York law in this case, there is no basis to conclude that such error was of a constitutional magnitude that it warrants habeas relief. It is entirely speculative to suggest that the failure by the court to give a missing witness charge had any impact on the trial. Indeed, as discussed *infra* in conjunction with petitioner's ineffective assistance of counsel claim, defense counsel did highlight the absence of eyewitnesses from trial both on cross-examination and in her summation. Accordingly, the Court cannot say that the failure to give a missing witness instruction violated petitioner's federal constitutional rights. *See, e.g., Davis v. Smith*, No. 06-CV-1389 (JKS), 2009 WL 236506, at *7 (N.D.N.Y. Feb. 2, 2009) ("Even if state law had called for the missing witness charge, its absence certainly did not so infect the entire trial as to deny Petitioner due process where, as here, the prosecutor's comments during his opening statement were equivocal, defense counsel was permitted to comment on the absence of any eye-witness testimony during summation, and the jury was instructed to limit itself to the evidence actually presented."); *Toland v. Walsh*, No. 04-CV-0773 (GLS), 2008 WL 65583, at *14–15 (N.D.N.Y. Jan. 4, 2008) (denying habeas relief where possibility that missing witness would give favorable testimony was "based upon nothing other than mere conjecture" and "federal habeas relief cannot be granted upon claims that are rooted in speculation"); *Brown v. Conway*, No. 06-CV-3555, 2007 U.S. Dist. LEXIS 85924, at *12 (E.D.N.Y.

Nov. 19, 2007) (denying habeas relief in part because "failure to give a missing witness charge will rarely support reversal or habeas relief since reviewing courts recognize the aura of gamesmanship that frequently accompanies requests for a missing witness charge as to which the trial judge will have a surer sense than any reviewing court" (citation and quotation marks omitted)). Accordingly, even assuming *arguendo* that petitioner's missing witness charge claim were properly preserved for habeas review, the Court determines that the claim is without merit.

4. Ineffective Assistance of Counsel

a. Legal Standard

Under the standard set forth in *Strickland v. Washington*, a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness,"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 680, 694 (1984).

The first prong requires a showing that counsel's performance was deficient. However, constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the

distorting effects of hindsight." *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Id.* (quoting *Strickland*, 466 U.S. at 691). "[A] lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision, and 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* (quoting *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996)). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that it "undermine[s] confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63–64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of

trial counsel's performance under the first prong of *Strickland*, the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

The Court proceeds to examine petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

### b. Application

Petitioner contends that he received ineffective assistance of counsel because his trial counsel (1) failed to call Detective Aylward and certain eyewitnesses; (2) failed to introduce Martinez's plea allocution in evidence; and (3) failed to request a missing witness charge. For the following reasons, this Court determines that petitioner's claim of ineffective assistance of counsel is without merit.

### i. Failure to Call Detective Aylward and the "No-Hit" Witnesses[9]

Petitioner argues that his counsel was ineffective for failing to call witnesses that had been unable to identify him from police photographs. Petitioner claims that testimony regarding these witnesses' inability to identify him would have undermined Rodriguez's testimony, in which she stated that she had been able to identify petitioner in a lineup.

Defense counsel explained why she did not call the "no-hit" witnesses at trial in an

affidavit submitted with respondent's supplemental opposition. (*See* Resp't Supp. Aff. Ex. A, Aff. of Dana Grossblatt, Esq., Aug. 2, 2011 ("Grossblatt Aff.").[10]) According to her affidavit, on October 10, 2006, defense counsel first learned of three witnesses who had failed to identify petitioner in a photo array. (*Id.* ¶ 5.) The very next day, she demanded these witnesses' names, dates of birth, addresses, and phone numbers from the District Attorney's office. (*Id.* ¶ 6.) On October 13, 2006, an ADA provided defense counsel with three names: Roque, Ruiz, and Miguel Quillen ("Quillen"). (*Id.*) Defense counsel "immediately sent an investigator out in search of the witnesses." (*Id.*) Defense counsel's investigator could not locate Quillen, but he did manage to interview Ruiz and Roque. (*Id.* ¶¶ 8–9.) Ruiz and Roque gave somewhat different accounts of what happened at the Laundry Palace when Pagan was stabbed. (*See id.*) Accordingly, defense counsel explained her strategy as follows:

---

[9] "No-hit" refers to the witnesses' failure to identify petitioner in photo arrays as one of the men who had attacked Pagan in the Laundry Palace on November 16, 2005.

[10] The Court may consider defense counsel's affidavit in deciding petitioner's ineffective assistance of counsel claim. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) ("We believe that a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."). Moreover, because defense counsel's affidavit is consistent with the other evidence in the record (including the transcript of Martinez's plea allocution and summaries of the interviews between defense counsel's private investigator and two of the no-hit witnesses), the Court need not hold an evidentiary hearing. *See, e.g., Nix v. United States*, 111 F. Supp. 2d 186, 189 (E.D.N.Y. 2000) (noting that *Sparman* "suggests that live testimony is not invariably necessary where the record in the form of 'affidavits or briefs' clearly and convincingly supports an inference that may be drawn without the assistance of such testimony").

At that point, I had already decided that I did not necessarily want to call Ruiz and Roque as witnesses at trial because, in light of their recollections of the night in question, I did not think that their testimony would be helpful to the petitioner. Their respective stories contradicted each other to some degree, and neither account excluded the possibility that the petitioner had stabbed the decedent. Moreover, their stories certainly did not exclude the possibility that the petitioner had participated in the attack. I also feared that there was a chance that Ruiz and/or Roque might even identify the petitioner as one of the attackers in court. I decided to try to figure out a way to present evidence regarding the "no hit" photo arrays, without actually calling Ruiz or Roque as witnesses.

(*Id.* ¶ 10.) Once trial started, defense counsel attempted to elicit testimony about these "no hit" witnesses from the police witnesses. (*Id.* ¶ 12.) The trial court held that it would not allow such evidence to be admitted through police witnesses because it would constitute hearsay. (*Id.*) Ultimately, defense counsel withdrew her attempt to introduce evidence of the "no hit" witnesses because she was "concerned that such testimony would open the door to evidence regarding Rodriguez's positive identification of the petitioner in a photo array." (*Id.* ¶ 13.) Defense counsel made her final decision not to call Ruiz or Roque "when Rodriguez, the People's only eyewitness, failed to identify the petitioner in court." (*Id.* ¶ 16.) Given the risks

associated with calling Ruiz or Roque, defense counsel focused on Rodriguez's inability to identify petitioner in court, and also highlighted to the jury that other eyewitnesses, whom the prosecution had not called to testify, had been present during the crime. (*Id.* ¶¶ 16–17.)

In light of defense counsel's affidavit, the Court concludes that defense counsel's decision not to call Ruiz or Roque was a reasonable one. Specifically, Rodriguez, the prosecution's only eyewitness, failed to identify petitioner in court. Defense counsel acted reasonably in relying on Rodriguez's failure to identify petitioner as a hole in the prosecution's case and a reason for the jury to discount Rodriguez's testimony. At best, Ruiz and Roque likely would have corroborated most of what had already been testified to by Rodriguez, with the added risk that they could have identified petitioner in the court room either as the stabber or as a participant in the attack on Pagan. Under these circumstances, it was a sound trial strategy not to call Ruiz or Roque.

It was also reasonable trial strategy for defense counsel not to call Detective Aylward. The prosecution called other detectives who worked on the case, and defense counsel reasonably could have concluded that their testimony was not strong enough to support a conviction, and that Detective Aylward's testimony would not have advanced the defense theory of the case.

Therefore, this Court determines that defense counsel made a reasonable strategic choice in not calling the "no hit" witnesses or Detective Aylward, and instead relying on Rodriguez's failure to identify petitioner in court. *See, e.g.*, *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("'[C]ounsel's decision as to 'whether to call specific witnesses—even ones that might offer

exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997))). Accordingly, petitioner has failed to establish the first prong of *Strickland*, and is not entitled to habeas relief on the basis of this claim.

### ii. Failure to Introduce
### Martinez's Plea Allocution

Next, petitioner argues that defense counsel was ineffective for failing to introduce Martinez's plea allocution in evidence. As noted *supra*, in Martinez's plea allocution, he admitted to fatally stabbing Pagan in response to an SWP attack on his cousin. Martinez also implicated petitioner in the stabbing.

Defense counsel's affidavit also explains why she did not offer Martinez's plea allocution in evidence. In her affidavit, defense counsel avers that she ordered the transcript of Martinez's plea allocution shortly after it occurred. (Grossblatt Aff. ¶ 4.) After reading the transcript, she learned that Martinez "had also inculpated the petitioner by stating that the petitioner had stabbed the decedent as well." (*Id.*) After petitioner's trial began, defense counsel sought to introduce in evidence Martinez's admission to stabbing Pagan without opening the door to evidence that Martinez had also inculpated petitioner. (*Id.* ¶ 11.) In the alternative, defense counsel sought to admit in evidence Martinez's certified conviction. (*Id.* ¶ 12.) The trial court expressed skepticism toward defense counsel's attempt to admit in evidence Martinez's plea allocution or certified conviction, and advised defense counsel to research the admissibility of such evidence. (*Id.* ¶ 12.) Defense counsel then abandoned her effort to admit this evidence. She has explained her decision-making process as follows:

> I did not pursue the admission of Martinez's plea minutes because the court had made clear that it was not inclined to permit this evidence, and, in any case, I feared that it would open the door to evidence regarding Martinez's inculpation of the petitioner during his plea proceeding. I came to the conclusion that Martinez's certificate of conviction would not do anything to help the petitioner's case because the People were arguing that the crime was a gang assault and that the petitioner was acting in concert. I had also sent my investigator to speak with Martinez. Based on the investigator's notes (which I have turned over to A.D.A. Rabinowitz), I learned that Martinez told the investigator that, not only had the petitioner thrown a rock at the deceased, but that the petitioner had also stabbed him. Ultimately, I decided that any evidence regarding Martinez would not help the petitioner's case, and, if anything, might backfire.

(*Id.* ¶ 14.)

Defense counsel's strategy was reasonable. If she had successfully admitted in evidence the portion of Martinez's plea allocution favorable to petitioner, the trial court would have needed to admit the entire transcript—including the portion in which

Martinez directly inculpated petitioner—under the rule of completeness. *See, e.g.*, *People v. Maerling*, 46 N.Y.2d 289, 298–99 (1978) (when an out-of-context admission is unfairly prejudicial to the party against whom it is offered, the remainder should be included to place it in an accurate perspective). Moreover, even if the trial court admitted in evidence only that portion of Martinez's plea allocution favorable to petitioner, defense counsel correctly observed that Martinez's allocution did not negate the possibility that petitioner had acted as a second stabber or accomplice. Indeed, the physical evidence did not rule out the possibility of petitioner as an accomplice or second stabber. Although Rodriguez witnessed only one stab to Pagan's chest, Dr. O'Reilly testified that Pagan had suffered three stab wounds. (Tr. at 564.) Further, there was evidence that a trail of blood led from the front door of the Laundry Palace to the coin kiosk (*id.* at 506), and Rodriguez had only witnessed the events once the men were near the coin kiosk (*id.* at 578–79). In addition, Martinez's plea allocution would not have ruled out the possibility that petitioner had acted in concert with the other members of his group to kill Pagan by throwing rocks both before and after Pagan was stabbed. Thus, even if the jury believed that Martinez had been the only individual to stab Pagan, petitioner's decision to throw a rock at Pagan during the stabbing (which was a rational conclusion to draw from the evidence introduced at trial) could have led a rational jury to believe that petitioner had acted with the requisite intent to establish his guilt under a theory of acting in concert.

For the foregoing reasons, defense counsel did not provide constitutionally deficient representation in making a strategic choice not to offer in evidence Martinez's plea allocution or certified conviction. *See, e.g.*, *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006) ("As a general rule, a *habeas* petitioner will be able to demonstrate that a trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken." (internal citations and quotation marks omitted)).

### iii. Failure to Request a Missing Witness Charge

Finally, defense counsel was not ineffective by failing to request such a missing witness instruction. Instead, defense counsel's affidavit makes clear that she made a strategic choice to question various witnesses, such as Detective Aponte and Rodriguez, about the presence of other eyewitnesses at the Laundry Palace on November 16, 2005. (Grossblatt Aff. ¶ 17.) Defense counsel referred to the absence of these eyewitnesses in her summation. (*Id.*) Thus, defense counsel was able to communicate to the jury that the prosecution had failed to call some eyewitnesses. Overall, defense counsel's decision to highlight the absence of certain eyewitnesses through cross-examination and summation, rather than through a missing witness instruction, falls within the realm of sound trial strategy. Accordingly, this strategic decision does not rise to the level of a Sixth Amendment violation. *See, e.g.*, *Best*, 219 F.3d at 201 ("Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance.'" (quoting *Strickland*, 466 U.S. at 689)); *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) ("Strategic choices made by counsel after thorough investigation . . . are virtually unchallengeable . . . and there is a strong presumption that counsel's performance falls 'within the wide range of reasonable professional assistance.'" (quoting *Strickland*, 466 U.S. at 689–90)).

Furthermore, for the reasons addressed *supra*, even if defense counsel had requested a missing witness charge, it is unclear whether the trial court would have granted the request. Defense counsel and the prosecutor were both allowed to look over police interviews with other eyewitnesses, and neither decided to call additional eyewitnesses. From the record, it is not clear that the uncalled eyewitnesses had material, noncumulative testimony to proffer at trial. Defense counsel cannot have provided ineffective assistance by failing to request an instruction that would not have been given. *See, e.g.*, *Davis v. Mantello*, 42 F. App'x 488, 491–92 (2d Cir. 2002) (finding trial counsel not ineffective where testifying witness and missing witness were together throughout duration of the crime, and missing witness would have added no new information). Accordingly, this claim of ineffective assistance of counsel also fails the first prong of the *Strickland* test.[11]

\* \* \*

In sum, with respect to all claims in this petition, this Court concludes that each of them is without merit, and that the state court determinations were not contrary to, or based on an unreasonable application of, clearly established law, nor were they an unreasonable determination of the facts in light of the state court record. Thus, the petition is denied in its entirety on the merits.

## IV. CONCLUSION

For the reasons set forth herein, this Court concludes that the Petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 11, 2014
Central Islip, New York

\* \* \*

Petitioner is represented by Richard M. Langone, Langone & Associates, PLLC, 600 Old Country Road, Suite 328, Garden City, NY 11530. Respondent is represented by Kathleen M. Rice, District Attorney, Nassau County, by Sarah Rabinowitz, 262 Old Country Road, Mineola, NY 11501.

---

[11] The Court also concludes that, even assuming petitioner established the first requirement of *Strickland*, he also has failed to establish any prejudice from defense counsel's alleged errors.